## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CASE NO. :**

SECURITIES AND EXCHANGE COMMISSION,　　　)

　　　　　　　　　　　　　　Plaintiff,　　　　　)

v.　　　　　　　　　　　　　　　　　　　　)

CARL E. BINETTE and　　　　　　　　　　)
PETER E. TALBOT,　　　　　　　　　　　　)

　　　　　　　　　　　　　　Defendants.　　　)

　　　　　　　　　　　　　　　　　　　　)

$3:09\ CV\ 30107-MAP$

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

### I. SUMMARY

1.　　This case involves insider trading by Defendant Carl E. Binette in the securities of Safeco Corp., formerly a publicly-traded, Seattle-based insurance company. In April 2008, Binette purchased "out of the money" Safeco options after he was tipped by his uncle, Defendant Peter E. Talbot, an Assistant Vice President at Hartford Investment Management Company ("HIMCO"). In early April 2008, HIMCO was evaluating a potential acquisition of Safeco for its parent company, The Hartford Financial Service Group, Inc. ("The Hartford").

2.　　Talbot learned material, nonpublic information about The Hartford's potential acquisition of Safeco through his employment at HIMCO, and tipped his nephew that Safeco was a likely acquisition target. Specifically, Talbot attended a meeting during which The Hartford's management told employees The Hartford was aggressively looking to acquire other insurance companies.

3.　　Talbot also opened another employee's folder on HIMCO's computer network,

which contained a copy of Safeco's latest Form 10-K and detailed spreadsheets listing Safeco's investment assets and HIMCO's evaluation of those assets. Talbot subsequently noticed key HIMCO employees were working long hours over the course of several weeks and were unwilling or unable to discuss their work with him. Having put together these pieces of nonpublic information, Talbot concluded Safeco was in play as an acquisition target and, on this basis, told Binette to purchase Safeco call options.

4.     To effectuate these trades, Talbot assisted Binette in opening a brokerage account to trade call options, and instructed him to put down false information on the account application that would allow him to trade options. Using funds he borrowed from his family, co-workers and a home equity line of credit, Binette, with Talbot's assistance and advice, bought Safeco call options from April 17, 2008 through April 22, 2008 for $37,260.85. On April 23, 2008, after Liberty Mutual Insurance Company announced it was acquiring Safeco for an all-cash price of $68.50 per share (a 50.6% premium over the prior day's closing price), Binette sold the Safeco call options for a profit of $615,833.06.

5.     By engaging in the conduct described above, and as described more fully below, Binette and Talbot violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The Commission requests that the Court enter (1) permanent injunctions restraining and enjoining Binette and Talbot from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, (2) an order holding Binette and Talbot jointly and severally liable for disgorgement, with prejudgment interest thereon, and (3) and order directing Binette and Talbot to each pay a civil money penalty.

2

## II. DEFENDANTS

6.    Binette, a 28 year-old resident of Ludlow, Massachusetts, is employed as a finance manager at a car dealership in Palmer, Massachusetts.

7.    Talbot, a 40 year-old resident of West Springfield, Massachusetts, was employed at HIMCO as an analyst from June 2005 to April 2008, and as an Assistant Vice President in HIMCO's Asset Backed Securities group from April 2008 to June 2008.

## III. RELEVANT ENTITIES

8.    Safeco was an insurance company incorporated in Washington and headquartered in Seattle. At all relevant times, Safeco's common stock was listed on the New York Stock Exchange and was registered with the Commission pursuant to Section 12(b) of the Exchange Act. Safeco's options were listed on the Chicago Board of Options Exchange, the NYSE Arca, Intercontinental Exchange, and the Philadelphia Stock Exchange.

9.    The Hartford is an insurance and financial services company incorporated in Delaware and headquartered in Hartford, Connecticut. HIMCO is The Hartford's wholly-owned investment management subsidiary.

10.   Liberty Mutual is an insurance company incorporated in Massachusetts and headquartered in Boston.

## IV.  JURISDICTION AND VENUE

11.   The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u-1.

12.   This Court has subject matter jurisdiction over this action pursuant to Sections 21(e), 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e), 78u-1, and 78aa.

13.   Personal jurisdiction and venue are proper in the District of Massachusetts because

3

Binette and Talbot reside in the District of Massachusetts and because many of their acts and transactions constituting violations of the Exchange Act occurred there.

14.    In connection with the conduct alleged in this Complaint, Binette and Talbot, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

## V.  FACTS

### A.    Background

15.    Liberty Mutual first contacted Safeco in November 2007, to discuss its interest in acquiring Safeco for an all-cash price of $68.50 per share.  Although Safeco indicated it did not have any interest at the time, from November 2007 to April 2008, Safeco continued to communicate with Liberty Mutual and other insurance companies that had expressed an interest in acquiring the company.

16.    The Hartford was one of the companies that expressed an interest in acquiring Safeco.  In the course of its discussions with Safeco, The Hartford retained investment bankers to advise it, and conducted its own analysis and due diligence related to the potential acquisition.

### B.    Talbot Learned Material Nonpublic Information
### About A Potential Acquisition of Safeco

17.    As an Assistant Vice President in the Asset Backed Securities group at HIMCO, Talbot worked as an analyst in the credit card, auto, and student loan sectors.  Although Talbot did not perform any work related to The Hartford's attempt to acquire Safeco (or any other insurance company), his employment at HIMCO provided him access to nonpublic information about Safeco.

18.    Talbot attended a meeting during which The Hartford management told employees the company was aggressively looking to acquire other insurance companies.

4

19.   In early April 2008, Talbot opened a folder on HIMCO's shared computer drive belonging to one of his co-worker, Glenn Gazdik, a HIMCO Vice President. Talbot sorted the files in the folder by date, and opened a file which contained Safeco's Form 10-K. He noticed the Safeco Form 10-K was entitled just 10-K, without any file name reference to Safeco. Gazdik's computer folder also contained detailed analyses and evaluations of Safeco's assets that had been created internally.

20.   Shortly after finding the 10-K in Gazdik's computer folder, Talbot became aware Gazdik was working long hours over several weeks with William Meaney, Head of Insurance Asset Management at HIMCO, and Rosario Distefano, a Risk Manager. Talbot knew Meaney was responsible for managing The Hartford's institutional money, and that it was unusual for him to be meeting with Distefano and Gazdik. Talbot also observed that the work pace and the number of meetings was unusual. Talbot observed that Gazdik and Meaney were regularly at Distefano's desk, and that Distefano met frequently with Meaney in the latter's office. Although Talbot and Distefano regularly had lunch together, Distefano had been unable to go out to lunch with him for two weeks straight during this period. When Talbot asked Distefano what he was working on, Distefano declined to tell him.

21.   Talbot put all these pieces of information together and concluded The Hartford was actively seeking to acquire Safeco.

C.   **Talbot Tips Binette and Instructs Him To Open a Brokerage Account**

22.   In early April 2008, Talbot shared his conclusions about Safeco being an acquisition target with his nephew, Binette. Talbot and Binette were very close – they had lived together from the time Binette was born until he turned 18, and Binette thought of Talbot as a big brother. On April 13, 2008, Talbot specifically told Binette to buy Safeco call options because

5

Safeco was a likely acquisition target.

23.     Three days later, on April 16, 2008, Talbot instructed Binette how to open an account at Think or Swim Inc., a registered broker-dealer, telling him to answer some questions falsely in the account opening forms in order to make sure Binette's application would be approved. In particular, based on Talbot's instructions, Binette overstated his experience trading options, the average size of his prior option trades, and the number of years he had traded stocks.

24.     Although Talbot had his own brokerage account at Think or Swim, he wanted the Safeco trades to be executed through Binette's account to evade detection by HIMCO and to circumvent HIMCO's trading policies. Talbot told Binette he could not buy Safeco options in his own account because he worked for HIMCO, a large insurance company that might be acquiring other insurance companies. Talbot also told Binette The Hartford required Talbot to seek pre-clearance and receive approval for any securities transactions. Finally, Talbot told Binette he was concerned about a conflict of interest based on The Hartford potentially acquiring Safeco, and he was concerned Safeco might be on a watch list of companies in which Hartford employees could not trade.

25.     During the course of his employment with HIMCO, Talbot executed a number of agreements pursuant to which he acknowledged, among other things (1) he had a duty to maintain the confidentiality of information he gained through his position at HIMCO; (2) his understanding of HIMCO's insider trading policy; and (3) he could not use material, nonpublic information to trade securities.

26.     Further, Talbot understood that prior to seeking pre-clearance, The Hartford required employees to certify they were not in possession of any material, nonpublic information. Talbot also understood The Hartford required all HIMCO employees to report their

6

securities holdings to the company each quarter.     Finally, Talbot was aware The Hartford required all HIMCO employees, including him, to have broker-dealers send duplicates of their monthly brokerage account statements to The Hartford.

27.    Binette set up the new brokerage account at Think or Swim Inc. as Talbot had instructed and provided Talbot with access. Talbot knew Binette's brokerage account username and password and used this information to access the new account, place purchase orders for Safeco call options, and change some orders Binette had placed. Talbot also called Think or Swim to discuss Binette's account, during which Talbot concealed his identity by not disclosing he was not the account owner. Talbot only logged onto Binette's account at Think or Swim while at home, not while at work.

28.    Talbot and Binette agreed Talbot would receive 25% of any profits gained through trading in Binette's account. To purchase the Safeco call options, Binette borrowed $10,000 from his home equity line, $10,000 from his aunt, and $10,000 from each of his supervisors, a general sales manager and the general manager of the car dealership where he was employed. Binette did not tell his supervisors how he was going to invest the money, but ultimately admitted to one of them he had invested in a "good acquisition target."

**D.    Talbot and Binette Trade Safeco Call Options**

29.    From April 17 through April 22, 208, Binette and Talbot engaged in a number of trades through the new account. Talbot instructed Binette, who had never traded options before, how and when to place the trades.

30.    On April 17, 2008, Binette bought 50 May 50 calls (call options expiring on May 16, 2008 with a $50 strike price) for $3.297; 3 May 55 calls (call options expiring on May 16, 2008 with a $55 strike price) for $34.39; and 500 shares of Safeco common stock for $23,035. The call

7

purchases accounted for 12% of the day's entire option volume for Safeco calls.

31.    The next day, Binette bought 250 May 50 calls (call options expiring on May 16, 2008 with a $50 strike price) for $26,487. These call purchases accounted for 87% of the day's entire option volume for Safeco calls.

32.    On April 21, 2008, Binette bought 20 May 50 calls (call options expiring on May 16, 2008 with a $50 strike price) for $1,219.95 and sold 350 shares of Safeco common stock for $16,003 (in order to purchase more call options). The call purchases accounted for 10% of the day's entire option volume for Safeco calls.

33.    On April 22, 2008, Binette bought 50 May 50 calls (call options expiring on May 16, 2008 with a $50 strike price) for approximately $5,200; 5 May 45 calls for $1,094 (call options expiring on May 16, 2008 with a $45 strike price); and sold 150 shares of Safeco common stock for $6,767. The call purchases accounted for 26% of the day's entire option volume for Safeco calls.

34.    Prior to April 2008, neither Binette nor Talbot had ever bought any Safeco securities.

35.    On April 23, 2008, Liberty Mutual announced it was acquiring Safeco for an all-cash price of $68.50 per share (a 50.6% premium over the prior day's closing price). Because Binette was busy at work and wanted to sell all of the Safeco call options, he asked his supervisor, the general sales manager, to sell them on the morning of April 23, 2008. Binette instructed the general sales manager to call Talbot to obtain instructions on how to sell the Safeco call options in Binette's account. Talbot provided those instructions to the general sales manager who effectuated the sale of all of the Safeco call options on April 23, 2008. Binette made a profit of $615,833.06.

8

## VI. CLAIMS FOR RELIEF

### COUNT I

#### Binette and Talbot Violated Section 10(b) of the
#### Exchange Act and Rule 10b-5 Thereunder

36.     The Commission repeats and realleges Paragraphs 1 through 35 of its Complaint.

37.     In April 2008, Binette and Talbot each knew or were severely reckless in not knowing the information concerning a sale of Safeco was material, confidential, and nonpublic and that Talbot breached a duty of trust or confidence to HIMCO and the Hartford by sharing the information with Binette. Binette and Talbot, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities, as described herein, have knowingly, willfully, or recklessly: (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices and courses of business which have operated, are now operating and will continue to operate as a fraud upon the purchasers of such securities.

38.     By reason of the foregoing, Binette and Talbot directly and indirectly, violated and, unless enjoined, are reasonably like to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Issue a Permanent Injunction, restraining and enjoining Carl E. Binette and Peter E. Talbot from violating Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Issue an Order holding Binette and Talbot jointly and severally liable, and directing them to disgorge their trading profits and ill-gotten gains from each illegal trade, and to pay prejudgment interest on those profits.

### III.

Issue an Order directing Binette and Talbot to pay civil penalties pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

### IV.

Grant such other and further relief as may be necessary and appropriate.

### V.

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

July 13, 2009                    By:    _____

C. Ian Anderson
Senior Trial Counsel

10

New York Reg. No. 2693067
Telephone: (305) 982-6317 (direct dial)
Email: andersonci@sec.gov

Drew D. Panahi
Senior Counsel
California Bar No. 224352
Telephone: (305) 982-6374 (direct dial)

Attorneys for Plaintiff
**U.S. SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154